CLINCHFIELD FUEL CO. v. HENDERSON IRON WORKS CO.

(Circuit Court of Appeals, Fifth Circuit. January 13, 1920.)

No. 3444.

COLLISION ☞153—DECREE AFFIRMED ON CONFLICTING EVIDENCE OF INJURY TO BARGE.

Decree affirmed, which found on conflicting evidence, in part taken in open court, that the leaking condition of a barge was not caused by collisions, but existed previously, and denied recovery of damages therefor.

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Suit in admiralty for collision by the Clinchfield Fuel Company against the Henderson Iron Works Company. Decree for libelant, from which it appeals. Affirmed.

See, also, 254 Fed. 411, 165 C. C. A. 631.

Harry T. Smith and William G. Caffey, both of Mobile, Ala., for appellant.

T. M. Stevens and Stevens, McCorvey & McLeod, all of Mobile, Ala., for appellee.

Before WALKER, Circuit Judge, and GRUBB and JACK, District Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

GRUBB, District Judge. This is an appeal from a decree of the District Court in favor of the appellant (libelant in that court) against the appellee (libelee in that court) for $100, for damages for injuries to the barge of appellant, which was caused to collide with a pier (Pier 19, Galveston) and with a steamship (the American), while being towed by a tug of appellee, in Galveston harbor, on June 22, 1915.

The District Judge found that both collisions were caused by the negligence of the tug, and the only question presented by this appeal relates to the sufficiency of the award of damages. The District Judge allowed damages for injuries done to the guard rail and fender of the barge, but denied damages to compensate for alleged injuries to her hull, which it was claimed caused her to leak and required her to be overhauled and caulked. He also denied appellant damages for the cost of a survey, claimed to have been made necessary by reason of the collisions.

The sole question is one of fact, and it is whether or not the leaking of the barge was caused or increased by either or both of the collisions. This question was resolved against appellant by the District Judge. Its solution depends upon whether the record shows that the barge leaked substantially more after the collisions than it had been doing before. The libelant relied entirely upon the claim of subsequent leakage to sustain its case. The record discloses no evidence of visible injury to the barge below the water line. Libelant's claim is that the force of the collisions opened the butts and seams of the barge, and that the immediate leaking of the barge, after the collisions, substantiates this contention. The whole case, therefore, depends upon whether the barge began to leak, or increased its leakage substantially, just after the collisions.

The libelant offered evidence tending to show that the barge was comparatively new; that it had just come off the ways, after having been overhauled, and was tight; that the only trip the barge had made, after having been overhauled, was a nine-mile trip across Galveston Bay from Texas City on the evening preceding the day of the two collisions. The libelant also offered in evidence the deposition of the master of the barge to the effect that he had examined the barge at 6 a. m. on the morning on which the collisions happened, and that there was only 1 inch of water in the barge at that time, and that he had again examined her at about 9:15 a. m., and after the happening of both collisions, and then found 15 inches of water in her hold. The barge remained afloat the remainder of that day and the next day, near the place of the last collision. Part of her cargo of coal was there unloaded into the vessel with which she had collided, part unloaded into another vessel, and the remainder was transferred to another barge. The injured barge was then taken to the Houston Ship Canal, to go on the ways, which were, however, found to be occupied. After remaining there some time the barge was taken to Lake Charles in September, where she was hauled up on the ways, and it was then that her seams and butts were found to be open. No examination of her hull had been or could have been made until then.

The libelee introduced the oral evidence of three witnesses—the

chief engineer of the tug, whose name was Taylor, and two of its deck hands, named Beretietch and Burns—to the effect that on the morning of the collisions, and the day succeeding the evening on which the barge had been towed from Texas City, they examined the position of the barge in the water as she lay at Pier No. 10, Galveston, where she had been put up overnight, and that she then listed perceptibly, in a way that showed that she had taken on considerable water. Burns also testified that he went on the barge and looked down into her hold and saw the water, and that there was a great deal of it. All three testified that Barrell, master of the barge, stated to them or in their presence that the barge was leaking. The witnesses also testified that the barge had encountered rough water on the preceding evening on the way over from Texas City to Pier No. 10, and that it was of a kind that would tend to cause her seams and butts to open, if she was too limber.

As tending to show that she was too limber, libelee points to the fact that when overhauled at Lake Charles, in September, after the collisions, new bulkheads were put in her at the instance of her owners for the purpose of stiffening her. The libelee also relies upon the statement of her master, Barrell, that when he examined the barge, after the collisions, she had 15 inches of water in her hold, and that he gauged the water entering her and found that she was taking on water at the rate of an inch an hour. If no greater rate than that had obtained, even since the earlier collision, it is clear that the 15 inches of water cannot be accounted for by the collisions, the earlier of which occurred only 3 hours before the water was gauged. To this argument libelant answers that the seams and butts may have reverted to their original positions, in the interim between the collisions and the time of the gauging of the water, and that this may have checked the entrance of the water, and that for that reason the rate of leakage may not have been constant during the whole period.

This contention, however, is a matter of theory, and not of evidence. Other facts and inferences are relied upon by the parties in support of their respective contentions, as to when substantial leakage commenced with relation to the time of the collisions. Thus the issue is not only one of fact, but of fact depending upon conflicting oral testimony, in part, of witnesses, who appeared in person before the District Judge, and whose demeanor and intelligence were accordingly available to him—as they are not to us—in determining their truthfulness and accuracy. The District Judge found from the evidence that the leakage was not, in fact, increased by the two collisions, but was as great before either of them occurred as it was after both of them occurred. In view of this affirmative finding as to the fact, he very naturally did not permit the natural tendency of such collisions to cause or increase leakage to control. Whatever conclusion we might have reached, if the issue had been presented to us as an original proposition, passing on it in the light of the District Judge's finding and the presumption of correctness that attaches to it, we are not prepared to disturb his conclusion that the entire leakage was due to the limber condition of the barge, and to its journey in that condition through

rough water from Texas City to Pier No. 10, and that the leakage was neither caused or substantially increased by the collisions.

If the leakage in its entirety existed before either collision, the District Judge was right in not charging the cost of the survey to appellee, since in that event it would have been required, though no collisions intervened.

The decree of the District Court was correct and is Affirmed.